**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ALI ALSUBAIE, an individual and SUWAYYIR SAAD ALSUBAIE, an individual (as the biological father and mother and legal guardians of Decedent, LAMAR ALSUBAIE, their female, infant daughter)

      Plaintiffs,


v.

1. <u>HCA INC., also known as HEALTHTRUST, INC</u>., also known as Hospital Corporation of America, a Delaware Corporation officially registered with the United States Securities and Exchange Commission as "HCA Inc." It's [EXACT NAME] – pursuant to its charter and S.E.C. regulations;

2. <u>HealthONE, also known as HCA – HealthONE LLC</u>, also known as HealthONE CLINIC SERVICES – CARDIOVASCULAR, LLC, HealthONE CLINIC SERVICES – MEDICAL SPECIALTIES, LLC, HealthONE CLINIC SERVICES – OBSTETRICS AND GYNECOLOGY, LLC, HealthONE CLINIC SERVICES – PEDIATRIC SPECIALTIES, LLC, HealthONE CLINIC SERVICES – PRIMARY CARE, LLC, HealthONE CLINIC SERVICES – SURGICAL SPECIALTIES, LLC, and/or HealthONE CLINIC SERVICES LLC, HCA Inc.'s wholly owned and controlled d/b/a for a group of hospitals, miscellaneous medical facilities, by means of joint venture, "affiliation" and/or other legal relation;

3. <u>HCA-HealthONE, LLC ROSE MEDICAL CENTER</u> an Affiliate;

4. <u>DR. PAMELA GEWINNER, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

5. <u>DR. JOE TONEY, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

6. <u>DR. JANIS JOHNSON</u>, M.D., individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

7. <u>DR. RICHARD CHRISTOPHER ROMERO, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

8. <u>DR. GARRETT M. GANNUCH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

1

9. <u>DR. JOHN C. ROTH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

10. <u>DR. ROTHENBURG, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

11. <u>DR. SUZANNE YODER, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

12. <u>DR. BRUCE BLYTH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

13. <u>BARBARA J. ROBEDEE, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

14. <u>MELISSA S. GIEK, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

15. <u>CHRISTEL CIPRI</u>, certified surgical technician, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

16. <u>LINDSAY HIETT, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

17. <u>COREY J. MALECKI</u>, Assistant, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

18. <u>MICHELLE F. JASKUNAS, C.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

19. <u>CHERYL GRAY, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

20. <u>A. SMITH, R.N.</u> individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

AND

21. <u>DR. WES TYSON PEDIATRIC PATHOLOGIST</u> , individually and as an Employee/Agent of HCA, INC and HealthONE LLC and  Presbyterian/St. Luke's Hospital.

Defendants.

---

**PLAINTIFFS' COMPLAINT and JURY DEMAND**

In support of their Complaint, Plaintiffs ALI ALSUBAIE and SUWAYYIR SAAD ALSUBAIE state and allege:

## PREAMBLE

This Complaint and Jury Demand is crafted to assure full compliance with F.R.C.P. 8 and its subparts (a)-(e).  In filing this complaint, the Plaintiffs by undersigned counsel are alert to and intent upon meeting with utmost regard, the full measure of Rule 8, its letter and intent, and, as set forth in F.R.C.P. 8 (e); "pleadings must be construed so as to do justice." Thus, due to the complexities and complexities underlying this lawsuit, the language of this complaint is placed in context, and requires additional language to place allegations into proper context. To achieve these ends Plaintiffs, at times, use form and explanatory notes to assure that Defendants fairly understand the nature, source and scope of allegations made as explained below.

1. Despite complexities which would justify a complaint format more consistent with a voluminous learned treatise than a Federal Court pleading, Plaintiffs' complaint seeks to  include the minimum threshold of information and allegation necessary to meet their Rule 8 obligations while simultaneously assuring that the individual Defendants herein can fairly understand in context, each and every allegation and the possible application of such allegation whether "general" or "specific" to the individual defendants with hope to avoid confusion and mindful of the potential for direct, non-waivable conflicts among or between each, of many defendants.

2. The Defendants should be permitted to meet "allegation[s]" which "must be simple, concise, and direct." [Rule 8 (d)(1)];

3. "No technical form is required" pursuant to Rule 8 (d)(1);

4. Thus, in order fulfill the core principle underlying Rule 8- "to do justice"- Plaintiffs will endeavor to employ the freedom from "technical form" [Rule 8(e)] to good purpose.

5. When necessary, explanatory notes, preceding, following or linked to allegations are added to assure that Defendants, and each of them, **do not fall prey to inadvertent harm** by fulfilling their duty to respond to Plaintiffs' claims.

**The purpose of this preamble is to secure justice in a United States Federal Court of Law, thereby preempting to the greatest extent possible, any unnecessary harm, which is foreseeable as a possibility or  probability. The words "unnecessary harm" herein contemplate application to all parties, not because of any concern regarding professional conduct but because of the Adversarial System's imposition of duty upon counsel to protect their individual client(s).**

## I.  JURISDICTION and VENUE

1. Plaintiffs are and were citizens and subjects of the Kingdom of Saudi Arabia. Decedent, LAMAR ALSUBAIE is the biological, female, infant of Plaintiffs identified in Paragraph 1 of this Complaint.

2. Defendant HCA, INC. aka HEALTHTRUST INC. is a Delaware, USA Corporation with headquarters in Nashville Tennessee, USA, and HCA Inc. is aka

   A. HCA, INC. (Hospital Corporation of America/ Healthtrust, Inc., and Healthtrust,Inc. is "the first tier subsidiary of HCA, INC." operates such that HCA, INC and HEALTHTRUST, INC file separate financial statements as required by the United States Securities and Exchange Commission disclosure regulations. Both entities (HCA, INC. and HEALTHTRUST, INC.) due to their corporate structural relationship operate so that all subsidiaries of HCA, INC. are also the operating subsidiaries of HEALTHTRUST, INC.

   B. HCA, INC., its affiliates, including direct, indirect subsidiaries, partnerships, and joint ventures arising from and related to HCA, INC. operate healthcare related facilities in twenty separate states in the United States of America and some facilities in England.

   C. HCA, INC.'s "affiliates" (Paragraph 3B) include: "HealthONE" and other Defendants named in this Complaint identified as Defendants 1, 2, 3 and 21in the caption including various aka's of said Defendants and Defendants' component subsidiaries as named in the caption of Plaintiffs' Complaint as Defendants 2 and 3.

D. Defendants 4-21 (listed below and incorporated herein) are persons, licensed physicians, surgeons, specialists, nurses, and assistants who are employees, agents and otherwise legally related, connected and subordinate to HCA, INC. and its HealthONE affiliates and further subject to direct control of HCA, INC. by multiple means including, by example and not limitation, HCA, INC.'s "Ethics and Compliance Policies," "Code of Conduct," "Monitoring and Auditing Programs," "Legal Policies and Procedure," "Quality Management (QM) Policies and Procedures," Document Management Protocols, Policies and Procedures, Multiple other enforceable, control mechanisms and their respective multiple subparts and further enforced by on site "Compliance Officers" and "Random Audits" and various, numerous other means by which HCA exerts control over:

4. DR. PAMELA GEWINNER, M.D.,

5. DR. JOE TONEY, M.D.,

6. DR. JANIS JOHNSON, M.D.

7. DR. RICHARD CHRISTOPHER ROMERO, M.D

8. DR. GARRETT M. GANNUCH, M.D.,

9. DR. JOHN C. ROTH, M.D

10. DR. ROTHENBURG, M.D

11. DR. SUZANNE YODER, M.D.,

12. DR. BRUCE BLYTH, M.D.,

13. BARBARA J. ROBEDEE, R.N.,

14. MELISSA S. GIEK, R.N.,

15. CHRISTEL CIPRI, certified surgical technician,

16. LINDSAY HIETT, R.N.,

17. COREY J. MALECKI, Assistant,

18. MICHELLE F. JASKUNAS, C.N.,

19. CHERYL GRAY, R.N.,

20. A. SMITH, R.N. (Rose Medical Center) whose initials and signatures appear on documents relevant to the issues in this case and for identification may be seen for example on "Physician's Order Form Newborn Perenteral Nutrition" documents dated 5-31-08, 5-30-08 and elsewhere.

21. DR. WES TYSON PEDIATRIC PATHOLOGIST , individually and as an Employee/Agent of Presbyterian/St. Luke's an affiliate of HCA, Inc.  whose pathological conclusions were (for whatever reason) adopted by Rose Medical Center's version of a pathology report signed by Lian A. Bonds 6-20-08 which connects Dr. Tyson's findings to the Rose Medical document as follows from page 2 "comment" section of report):

"Materials on this case were forwarded directly to Dr. Wes Tyson, pediatric pathologist at Presbyterian/St. Luke's Medical Center; Denver, Colorado.  The content of this report (Rose presumably) including microscopic description, diagnosis and above comments reflect his (presumably Tyson's) findings. (A complete copy of the consultant's report is available through the Pathology Department.)

3. Federal Jurisdiction arises from 28 U.S.C. §1332(a)(2) (Diversity)

4. Venue is proper in the District of Colorado as the events surrounding the allegations of Plaintiffs' complaint arose in Denver, Colorado.


## II.  GENERAL ALLEGATIONS

### Part I.

5. This action is a wrongful death and negligence claim brought by Plaintiffs against Defendants as detailed below.

6. This action is founded in many respects upon Colorado Revised Statute ("C.R.S."), Title 13, Article 21, section 201, et.seq. (the "Wrongful Death Statute").

7. This action is intended to, where applicable:

- "Fully" carry out "the true intent and meaning of the General Assembly"
- Presumes "a just and reasonable result is intended"
- Presumes "a result feasible of execution is intended"
- Presumes " the entire statute is intended to be effective"


8. This action involves the "wrongful act(s), neglect or default(s) causing death which, as to one or more party defendants "constitute a felonious killing, as defined in section 15-11-803(1)(B), and as determined in the manner described in section 15-11-803(7), C.R.S. which  provides there "**shall be no limitation on the damages** for

6

non-economic loss or injury recoverable in such action" (C.R.S. 13-21-203) (emphasis added).

9. The "Felonious killing" for purposes of this action involve, "recklessly" causing the death of an infant by consciously disregarding "a substantial and unjustifiable risk."

10. Plaintiffs expressly do not contend any defendant intentionally caused the death of a helpless infant.

## Part II.

11. Decedent LAMAR ALSUBAIE, was born on April 22, 2008, at 32 weeks gestation at Rose Medical Center, a hospital owned and operated by HealthONE and died on June 2, 2008 at Rose Medical Center, having spent her short life at and in the care of Rose Medical Center and Defendants 4-21.

12. Decedent LAMAR ALSUBAIE, although born premature was by measure of pediatric medicine, a premature baby with expected premature baby health issues consistent with a neonate of 32 week gestation as reflected in Rose Medical Center Records.

13. Decedent LAMAR ALSUBAIE, was expected to be discharged to the care of her parents, the Plaintiffs in this matter, as reflected in Rose Medical Center records including but not limited to "Discharge Teaching and Planning" sheets and "Progress Reports" found in Rose Medical Center records.

14. Further evidence of Decedent's optimistic future was conveyed to Lamar's parents on May 30, 2008 (3 days before Lamar died) by Dr. Gewinner, as reflected in a progress report of 5/30/08 which included for example, and not by limitation that:

    a. Decedent LAMAR ALSUBAIE had "three major issues."

        1. <u>Hypothyroidism</u> – To be treated with synthriod – first three years of life (and could be function of premature birth)

        2. <u>Pyloricstenosis</u> – Dr. Gewinner drew a picture for Plaintiffs and explained the operation to correct the condition.

        3. <u>Kidney problems</u> – Specifically, a form of nephrotic syndrome which could require kidney transplant at approximately age 1. Further, it was explained that specifically Dr. Gewinner knew of a patient in a similar condition, now at age 20 in Colorado.

4. The full extent and accuracy of the nephrotic syndrome diagnosis may be in question since the Medical Examiner who performed the autopsy on Lamar's body microscopically studied kidney tissue and reached factual conclusions that may not permit differential diagnosis of such syndrome, since the glomeruli did not show all the features consistent with such syndrome.

b. The "three major issues" were accounted for by Defendants 4-21 and came with planned ameliorative procedures to ensure Lamar's future life.  Followed by echocardiogram.

15. Operative/surgical procedures were planned for Monday June 2, 2008.

16. However, on May 28, 2008, Dr. Gewinner performed a "placement of surgical venous catheter" procedure as reflected in a very sparse, imperfect procedure/op report (likely inconsistent with minimal medical documentation requirements).

17. The procedure identified in Paragraph 16 above was marked by multiple "complications."

18. The procedure in Paragraph 16 refers to "placement of CVL" (presumably, central venous line) and identifies the time of procedure as 14:30 (i.e. 2:30 p.m.)

19. From 4/22/08 to 5/28/08 (morning) "physicians order forms newborn peripheral nutrition" and identifies use of a "peripheral line."

20. On 5/29/08 the same "form" (Paragraph 13) refers to "central" line although there is a handwritten note – "New order at 13:30 (1:30 p.m.) despite this form's section "A" which requires orders to pharmacy before 12:00 p.m. daily."

21. Between 5/28/08 (procedure identified in Paragraph 10) through 6/2/08 and upon reliance of Rose Medical Records retrieved in November 2009 by Plaintiff ALI ALSUBAIE, 3 additional procedures were performed (all on 6/2/08 at about 5:30 p.m.)

a. A kidney biopsy as discussed on 5/30/08 with Lamar's parents.

b. A pyloromyotomy to correct pyloricstenosis as discussed on 5/30/08.

c. A Brouviac Catheter Placement using a subclavian approach (Seldinger technique).  Which catheter would be introduced such that the distal end of the Broviac (i.e. the tip or end) would be properly placed inside the Superior Vena

Cava at the point (junction) where the Superior Vena Cava meets and flows into the right atrium of the heart.  But this procedure was not contracted or discussed during the 5/30/08 conference as one of the 3 major issues.

22. A Broviac Catheter with its soft tip is and was manufactured by Apro Access Systems.

23. Although common sense would suggest that a surgeon would know the protocols for introduction and placement of a Broviac catheter, "BARD," nonetheless provides very specific instructions for surgeons/doctors/nurses for such a procedure.

24. The BARD instructions manuals are quite thorough, detailed and include pictures, illustrations among other forms of guidance with such clarity that it would be rather difficult to imagine such instructions could not be followed.

25. Further, an experienced pediatric specialist and pediatric surgeon would be expected to perform such procedure (which is 1) highly common in general; and 2) more common in infants) as a result of training and experience.

26. Further, with respect to Paragraph 25 above, it is reasonable to assume that even an average person untrained in the art and science of medicine would most certainly expect such physicians as described in Paragraph 25 above to perform with even greater ease the introduction and placement of a Broviac Catheter in light of Rose Medical Center's persistent use of the moniker "**Denver's Baby Hospital**."

27. Further, there may be found a number of learned medical journals, articles regarding the procedure in Paragraph 21C above.

28. With respect to Paragraph 27 above it is well accepted that the primary concern with respect to the procedure identified in Paragraph 21C above is risk of infection.

29. A rare, but potentially deadly complication might include perforation of a central vessel such as the superior vena cava.

30. If such complication described in Paragraph 29 should occur, it is understood that acute, deadly result may ensue and therefore any medical professional, physician, nurse and especially a pediatric surgeon would react quickly to take such appropriate medical measures such as (stent graft for example) to prevent further harm.

31. The "further harm" stated in Paragraph 30 above would, for example, permit a substantial risk that a subsequent enfusion of solution into the Broviac by a nurse, as

expected, foreseeable and indeed required would, cause fluid to, for example, enter the pericardial sac (protective sac surrounding the heart).  That accumulation of such fluid would, in plain English, exert pressure on a helpless to communicate, infant heart, cause compression of the heart, leads to Bradycardia (slowing of heart rate) and ultimate death.  A condition well known as "Cardiac Tamponade."

32. With respect to Paragraph 29, there are numerous indicators of such perforation, both before onset of cardiac tamponade and after by means of fluoroscope (c-arm/intensifier) chest x-ray, echocardiogram, other radiological methods, non radiological indicators, all of which would raise red flags for a medical professional of the creation of a substantial risk including death.

**Part III**.

33. Plaintiffs' incorporate Paragraphs 1-33 of Plaintiffs' Complaint.

34. On June 2, 2008, at approximately 5:30 p.m. Dr. Suzanne Yoder started the procedure of introduction and placement of the Broviac Catheter.

35. Rose Medical Center records indicate that (a) the procedure was problematic; (b) it (Broviac placement) took approximately 43 minutes and multiple attempts; (c) from 5:30 p.m. to 6:02 p.m. pre procedure functions appear to have been carried out by the surgical team.

36. Rose Medical Center records indicate that, that Broviac procedure itself progressed as follows:

   a.  Started 6:02 p.m.

   b.  Finished 6:45 p.m.

   c.  That the surgical nurse who started the procedure (Michelle F. Jaskunas) was relieved just 2 minutes before the completion of the Broviac placement. (She was relieved by nurse Barbara J. Robedee at 18:43/6:43).

37. Rose Medical Center records, to the extent reliable, reflect that 2 catheters were used. The first (per Dr. Yoder's operative report) was "…dysfunctioning." "…removed" and "an additional 4.2 catheter was obtained…"

38. The statements in Paragraph 38 above appear to be in conflict with "interactive assessment records" or at least suggest incomplete records, page 8 heading refers to "implants" but mentions only one, not two, devices.  The "BARD Broviac 4.2 single lumen."  Although the serial number and quantity (1) are specifically identified, there is no mention of a first Broviac (perhaps a function of Broviac 1 not being the Broviac implanted).

39. Rose Medical Center records, specifically, page 12 "intra-op documents" are or perhaps appear to be confusing and inconsistent in the following <u>general</u> manner (specifics not addressed here):

    a.  Rose has 2 such reports one identifies the procedure in "OR Room 1"

    b.  The other identifies the procedure in "OR Room 8"

    c.  A third version (the one which appears was given Medical Examiner, Amy Martin, appear quite different and does not include even the category "implants" among other distinctions.

40. Dr. Yoder's operative report (signed on June 9, 2008) does not even include the topic heading "Complications" for a procedure which appears rife with complications.

41. Further, virtually all documentation which relates to June 2, 2008/Lamar Alsubaie, unlike Dr. Yoder's report, appear signed/completed on 6/2/08 or 6/3/08 (the day after Lamar Alsubaie died.)

42. In sum, the 6-2-08 procedure(s) unfolded as follows according to Rose Medical documentation (which is subject to serious credibility questions due to a multitude of irregularities as further described below):

    a.  Dr. Yoder first performed the "Broviac" introduction/placement

    b.  Dr. Yoder second performed the "pyloromyotomy"

    c.  Dr. Blyth performed the kidney biopsy, ostensibly to rule out/confirm a diagnosis of nephrotic syndrome.

    d.  Dr. Blyth completed the procedure at 8:00 pm, but nevertheless remained in the operating room with the infant until 8:22 p.m. without documenting the medical purpose for his extended presence in the records.

11

43. Br. Blyth's procedure is confirmed by the "informed consent" given to the parents indicating what one would expect to see: "a) Procedure- renal biopsy; … Reason: - nephrotic syndrome".

44. Dr. Blyth and/or Dr. Yoder obtained a second "informed consent" which inexplicably refers to a "right renal biopsy" and provides a new stated "reason" as: "find cause of protein leakage", in patently un-medical terminology.  Such terminology was expressly designed to mislead the parents as to the true motives for the second consent and to mask any disclosure of the true condition of Lamar Alsubaie and the grave danger to her life caused by the defendants.

45. The second consent form fails to follow medical conventions in the following respects:

    a. The first informed consent expressly allowed for the renal biopsy;

    b. The stated reason to "find cause of protein leakage" is erroneous in the context disclosed to the parents;

    c. A biopsy specimen presumably, and as indicated, goes to a pathologist who examines a specimen "grossly" and "microscopically" in order to report findings consistent or inconsistent with the nephrotic syndrome diagnosis.

46. Employing the term "leakage" as the stated medical "reason" for the biopsy procedure is misleading and a non-sequitur in the context of the Plaintiffs' decedent's condition as follows:

    a. The need for the biopsy was triggered by elevated levels of the protein albumin in urine specimens long before the biopsy scheduled for 6-2-08.

    b. Albumin is an important protein which implicates kidney function and related issues.

    c. As a result, this concern was the catalyst for the biopsy as the pathology results obtained would shed light on potential kidney problems.

    d. "Leakage" was never the cause of the need for the biopsy surgery.

    e. Further, Dr. Blyth's post operative note from 6-2-08 regarding the biopsy identified "nephrotic syndrome" as the reason for the surgery.

47. The so-called "informed consent" is further problematic in light of the special duties a physician owes to a patient when assuring good, accurate, truthful information is conveyed  to allow complete understanding.

48. Dr. Amy Martin, M.D. Chief Medical Examiner (City and County of Denver) commenced autopsy of Lamar Alsubaie on June3, 2008 at 11:55 a.m.

49. Dr. Martin's autopsy included both external and internal observation, review of anatomical systems, histological analysis and under the heading "microscopic examination" list her observations relative to the following organs/glands:

    a.  Brain;

    b.  Heart;

    c.  Lungs;

    d.  Kidney;

    e.  Thymus gland;

    f.  Adrenal gland;

    g.  Thyroid gland;

    h.  Liver;

    i.  Pancreas;

    j.  Spleen;

Her findings were "no significant changes" for the brain, heart, adrenal, thyroid, pancreas and spleen.

50. As to items c.-lungs, d.- kidneys, e.-Thymus gland, h.-liver above, Dr. Martin's findings include:

    a.  Lungs- "atelectasis" (although the  medical term atelectasis may be further classified by type, form, feature, by use of descriptive or qualifying words, in essence atelectasis is a term generally used to denote a decrease or loss of air in all or part of the lung, accompanied by a resulting loss of lung volume. Further, as to "volume", a reference to "pulmonary collapse" worth noting here is that such collapse may be, or, have been induced by e.g. "pleural effusion" –or "effusion" –[escape of fluid from blood vessel] "pleural "- [reference here to cavity in which lungs rest which cavity is enveloped by a serous membrane]

    b.  Kidney- "…what appear to be the proximal renal tubules are dilated and contain some pink material…no inflammation associated with this process. Glomeruli [plexus of capillaries] are appropriately developed…no definite changes. Only a rare eosinophilic hyaline cast is seen." (A white blood cell type leukocyte with a "clearish" appearance).

    c.  "Thymus Gland normally developed…some mild involutional change. (again application dependent. However, e.g. return of large organ to normal size or the "inward turn" of the edges of a part)

    d.  Liver- congestion; "Extramedullary (e.g. outside of) hematopoiesis (aka) "hemopoeisis" (process/formation of blood cells or formed elements) no

significant changes.  "Congestion" (Generally-abnormal amount in fluid in e.g. part of an organ)-

51. The reason Lamar Alsubaie died cannot be determined by reference to, or, reliance upon, the analytical tools of medicine.

52. The cause of death of Lamar Alsubaie does not depend upon or arise from a medical, anatomically identifiable condition, disease, disorder or result from medical error.

53. Medical examiner Amy Martin M.D. concluded that "death is due to complications of presumed pericardial tamponade by TPN [Total Perenteral Nutrition] solution" (i.e. nutrients, etc., infused , not by mouth, but Broviac Catheter, which should have been placed such that the tip of the Broviac rested inside of the Superior Vena Cava (SVC) at or above the right Atrium of the heart-into which deoxygenated blood is received directly by the Superior Vena Cava. Therefore, an ideal place to push fluids, here TPN,- so that the fluids, [TPN] exit the Broviac tip, flow into the right atrium to be dispersed throughout the infant's body as an efficient function of heart anatomy and circulatory mechanics).

54. Further, (in context of preceding paragraph), Dr. Martin noted: "due to inadvertent perforation of Superior Vena  Cava by Broviac Catheter (protruding 1.8 cm outside SVC)…the manner of death is accident."

55. In plain English, a nurse fed Lamar as intended and indeed required. TPN was pushed into the Broviac catheter.

56. The TPN solution pushed into the Broviac catheter did not exit the distal tip of the catheter inside the Superior Vena Cava and into the right atrium of the heart.

57. Because the Broviac tip had perforated the Superior Vena Cava and protruded 1.8 cm (about 3/4ths of an inch), into the pericardial sac which surrounds the heart, the pericardial sac was filled with TPN to sufficient degree to compress the heart itself leading to "bradycardia" (reduced heart rate) and ultimately death.

58. Feeding infant Lamar Alsubaie on 6-2-08 by means of infusion of TPN via Broviac catheter installed for this purpose was not negligent, was in fact expected, foreseeable and what one would expect a neonatal nurse, or anyone for that matter, to do: <u>feed the baby.</u>

59. Feeding this baby, Lamar Alsubaie, was <u>not</u> the cause of death. (Obviously had a nurse been on notice that the Broviac tip was in the pericardium and not the SVC, said nurse would not push the fluid into the Broviac knowing it would exit into the pericardium and, though rare, most certainly, and at best, create a dangerous emergency, if not addressed immediately, which would kill Lamar by compressing her heart. (Cardiac tamponade.)

PART B.

60. No person; trained nurse, physician, unlicensed medical person, a person of average intellect and "reason" would push fluid into a tube (here a Broviac catheter, placed for long term TPN feeding) including a parent, including the mother and father of Lamar Alsubaie **knowing it would kill their infant.**

61. To do that which is described in the preceding paragraph would defy not only medical reasoning but the most basic form of common sense.

62. Feeding Lamar was not the cause of Lamar's death.

63. The cause of Lamar's death may only be determined by using the Medical Examiner's observation of a Broviac tip protruding through the SVC and TPN solution in the pericardial sac as a <u>starting point</u>, then trace backward in time to determine:

   a.  At what point did the pediatric specialists, surgeons, physicians, nurses, others who provided care for Lamar *know* that the Broviac perforated the SVC?

   b.  Because cardiac tamponade is a rare, but deadly complication of catheter placement-the first sign of it (or red flag) requires immediate medical intervention.

   c.  Notice of perforation by Rose medical employees and named Defendants followed by a failure to take immediate action created the "substantial risk" that mere feeding of Lamar will kill Lamar.

64. The answers to the questions posed and concerns expressed in the preceding paragraph are found in the Rose Medical records regarding Lamar Alsubaie directly, and by reasonable, indeed unassailable inference.

**65.** Before turning to said "Rose Medical records" it must be noted that said records **on their face,** are unmedical, unscientific, imprecise, otherwise compromised as listed below by way of example, not limitation: these records

   a.  Lack critical information which absence is <u>inconceivable</u> in contemporary "evidence based medicine";

   b.  When reviewed and compared are rife with inconsistencies;

   c.  Use terms which are precise, intended to be precise, and must be precise by the antithetical application and use of terms which do not merely fail to

accurately describe procedures and findings, etc. But achieve the troubling result that in many instances and by loose application, (for example misuse of terms, use of potentially synonymous terms in the same document.)

    i.  Deprive both expert and laypersons the opportunity to determine what occurred, how it occurred, whether a condition was detected or acted upon.

    ii.  Mislead by employment of terms which, in context are capable of multiple interpretations.

    d.  Appear in some instances to have been altered.

66. For example, the *Rose version* of a document which was transmitted to the Medical Examiner was altered.

67. The defective nature of said records as aforesaid is prima facie incomprehensible in contemporary medicine.

68. The defective nature of said documents as aforesaid achieves nothing less than "cognitive dissonance" when measured against HCA Inc.'s own comprehensive, excruciatingly detailed, policies, protocols, codes of ethics, compliance measures found in volumes of "reference numbered" rules. In particular, this vast compilation includes, among other things, **vast subsets** of the "**vast compilation**" which subsets command both form and content of records.

69. The "scope" (or population intended to be subject to and controlled by) of said policies, rules…etc., includes nothing less than anyone/everyone, physician to gnat on a facility wall connected to, by any means, all persons and entities which are merely subparts of a large matrix, forming one entity, HCA Inc. and its tentacles, which

tentacles despite legal devices used to create layers of protection, unite all parts into a "whole".

70. The "whole" as aforesaid <u>is</u> despite public proclamations of beneficent purpose deliberately broadcast to a United States citizenry hungry for "healthcare crisis" solutions, **a for profit corporation- a business.**

71. The for-profit business ("the whole") as aforesaid does include, in reliance upon HCA, Inc. documents, a primary focus upon the practice of medicine, not in a pure sense the <u>art or science of it</u>, rather, as a source of income and profit.

72. The marriage of a *profession* designed to provide learned care and skill to heal human suffering to a corporate leviathan need not in theory, fail to serve the greater good- healing the infirm. Although such a marriage would necessarily need to contend with the tension between <u>corporate profit objectives</u>, on one hand and to a fault, <u>saving a patient,</u> a human being, at any cost.

73. In real world dynamics such a marriage could be quite disharmonious. With any benefit subject to adverse consequence- the death of an infant finds cause in base, ignoble, human behavior, <u>not medical best practices,</u> mistake, error or complication.

74. The preceding paragraphs help give context to what happened to Lamar Alsubaie at Rose Medical Center although intended to provide a backdrop for understanding what happened. The precise legal cause can only be determined by the analytical format of the legal system and common sense.


<u>FIRST CLAIM FOR RELIEF</u>

(Wrongful Death)

75. At 11:55 am of June 3, 2008, about 12 hours after her death, Lamar Alsubaie's body was examined by Chief Medical Examiner Amy Martin, M.D. in conformance with expected pathological protocol and methodology.  Dr. Martin's report contains her observations and conclusions.

76. After opening the body for "internal examination" she makes multiple observations including the TPN "fluid" in the pericardial sac (where it should *not* be).  It is the same fluid (TPN) introduced into Lamar's body a few hours earlier by a nurse at Rose Medical Center.

77. The TPN fluid was delivered by "pushing" it into a "Broviac" catheter.

78. A Broviac catheter by its design is intended for long term use and in the care of infants, a gift for pediatricians and nurses.

79. The Broviac "catheter", "specially formulated" and "radiopaque" (i.e. opacity to or impenetrability to, radiology such as X-rays so as to make it visible to nurses and doctors installing it) serves many purposes in pediatric medicine.

80. Properly placed, with its tip (exit portal) inside the Superior Vena Cava just superior to (above) the right atrium of the heart, the Broviac is a sound means for delivering nutrients and medicines to an infant, who, for whatever reason should not be fed by mouth

81. Previously, Plaintiffs drew attention to what the Medical Examiner saw; TPN fluid in the wrong place, the pericardial sac or "pericardium" ( the membrane covering the heart and anatomical beginning point of "the great vessels" such as the Superior Vena Cava; the pericardium is "a closed sac.")

82. TPN fluid does not belong in the pericardium for many reasons. An accumulation of fluid in the "closed sac" which contains the heart would compress it when the fluid reached sufficient volume to cause "cardiac tamponade" (compression of the heart). In plain language, and in light of pressure, available space in the pericardium, various related factors, the fluid will by anatomical necessity occupy space belonging to the heart. At best this presents an emergency, at worst a fatality.

83. The preceding paragraph having addressed one of two significant reasons that TPN does not belong in the pericardium.  The second may be described as follows:

   a.  "TPN" total perenteral nutrition, means in general and certainly as to Lamar Alsubaie, provision of nutrition, medication and anything else to sustain her, not by mouth but by tube. The tube in Lamar's case was a "Broviac catheter".

   b.  TPN also serves another critical purpose. By use of TPN, a pediatrician may methodically track the list of substances entering the infant's body and the quantity of each substance. Thus a monitoring pediatrician can now enhance the reliability, and validity of ongoing lab assessments.  Blood and urine may be drawn from an infant for laboratory analysis so that organic/inorganic compounds of the infant's biochemistry may be measured against well accepted "reference ranges" to facilitate the pediatrician's ongoing assessment of an infant's health, the detection of elevated/diminished (high/low) levels of various substances may implicate various possible disorders for example, (i.e. assisting the differential diagnostic process.) Armed with controlled, identified amounts and types of substances ingested provides enlightened opportunity to obtain information from lab results with increased reliability by avoiding

misinterpretation of values which could be influenced by ingestion of

types/amount of substances unknown/unmeasured.

84. Most certainly, it would be absurd, from a physician's perspective to feed an infant by

mouth after placement of a feeding tube (Broviac catheter here).  Whether due to

emesis (vomiting) or its cause (pyloric stenosis here), the decision to

install/place/thread a Broviac catheter line into the Superior Vena Cava of an infant is

taken seriously and a long term commitment to attending such catheter. Preempting

infection, etc. is a given.


85. Medical Examiner Dr. Amy Martin, M.D. observed something else of import during

her internal examination of Lamar Alsubaie at autopsy. Her description and the

language she used is scientific, medical, measured. Nonetheless, a gifted author of

literature would likely fail to describe it with greater but horrific eloquence.  Thus

verbatim quote of Dr. Amy Martin's autopsy report page1 is set forth verbatim from

pps. 1 and 5:

> "…
> A. Perforation of Superior Vena Cava by distal end of Broviac catheter,
> with approximately 1.8 cm of Broviac catheter protruding through
> vessel.[1]
> B. Fluid removed from pericardial sac at hospital [Rose] consistent with
> TPN solution…."

86. Lamar Alsubaie was pronounced dead at 11:38 p.m. June 2, 2008 at Rose Medical

Center about 12 hours before Dr. Martin's autopsy started.

---

[1] In common US/English measurement 1 cm.=.3937ths of an inch. Thus 1.8cm. x .3937=.70866
of 1 inch or almost 3/4ths of an inch.

87. Plaintiffs aver and allege upon what is already known and upon reasonable belief and inference, that Lamar Alsubaie did not die because she was fed TPN by Broviac catheter. Rather, the cause of death, both as a matter of simple, common sense and

88. legal proximate cause is found in base, servile, ignoble, human behavior. Plaintiffs aver that :

    a.   Lamar Alsubaie should not have been fed via Broviac on the eve of her death.

    b.   Defendants 4-21 knew and had notice of the fact that the Superior Vena Cava had been perforated.

    c.   With respect to allegation b above, such notice and knowledge was obtained well in advance of the death of Lamar Alsubaie and the Broviac feeding which should not have occurred on June 2, 2008.

    d.   Dr. Pam Gewinner, (as reflected in a baffling example of an operative/procedural report) on 5-28-08 performed a procedure entitled "placement of surgical venous catheter….Baby's name: Alsubaie, Lamar, Indications: Difficult IV access complications: Line was accidentally pulled out…." (this procedure was six days before Lamar's death .)

    e.   The 5-28-08 Gewinner report refers to the "catheter" variously as "catheter, IV, line, CVL, CVL, catheter, catheter, catheter."  Terms all arguably accurate yet troubling in their overall context due to the need and requirement for precision in medical terms.

    f.   Doctors, nurses, surgeons radiologists fail to detect on x-ray or otherwise that a perforation of the Superior Vena Cava has occurred-an emergency, and despite the Broviac's opacity as to x-ray, despite "Beck's Triad" (onset signs of cardiac tamponade, despite ,  (Dr. Yoder's 6-2-08 Broviac compilations-despite other

warning signs/red flags known to such Defendant here by training, experience and otherwise.  Despite widely disseminated learned treatises on these issues, textbooks….

g.  Dr. Suzanne Yoder performed a Broviac placement procedure and pyloromyotomy to correct Lamar's pyloric stenosis, while Dr. Blyth subsequently, but as part of an ongoing procedure performed a kidney biopsy. And the Broviac placement procedure was rife with alleged complications including "unable to get good blood return" (Dr. Yoder's words), when failure to get good blood return is **the subject** of a learned treatise identifying it as a warning sign of misplacement/vessel perforation, a subject which appears in other medical literature.

h.  Dr. Yoder's operative report does not include a standard topic heading for "Complications".

i.  Dr. Yoder's report reflects she is satisfied that the Broviac tip is properly placed by reference to a pre-existing PICC line. Except the PICC line, which x-ray does detect on several occasions before 6-2-08,-on said x-rays have it in, or wandering about the central venous structure.

j.  It took Dr. Yoder 43 minutes to place a Broviac in Lamar which implicates some difficulty. And further Dr. Yoder having identified one Broviac as dysfunctioning implicating the use of at least two Broviacs- when "Intraop Assessment" documents identify by lot number, etc. only one Broviac. And, of further interest; the intraop assessment form which reaches the Medical Examiner's office seems to be missing that section of the report.

23

k.  As to "Intraop" reports there are some inconsistencies and perhaps more than one version (not due to different authors only, but for example, one which has the ongoing procedure in operating room "8"-but another which has the 6-2-08 Yoder/Blyth procedure in OR "1".)

l.  Undersigned counsel were given a copy of Rose records which were retrieved by a grieving father on November 2009-and –these records are clearly and unequivocally missing documents which should be, but are not, included.

m.  Undersigned counsel based on said records, cannot find a Defendant's acknowledgement of a potentially fatal condition-vessel perforation onset of cardiac tamponade.

n.  That Dr. Yoder's 43 minute Broviac placement attempts were, per her operative report performed with the aid of fluoroscopy (a motion picture x-ray) but a few hours later Dr. Gannuch/radiology receives a an emergency call and his report identifies *18 seconds* of fluoroscopy-(from a 43 minute procedure).

<u>NEGLIGENT SUPERVISION</u> –Against HCA, et.al

(Defendants 1, 2 and 3)

88.  Plaintiffs hereby incorporate all preceding paragraphs herein.

89. Defendants HCA, Inc., HealthONE and Rose Medical Center (Defendants 1,2 and 3) by and through means of their extensive records and compliance manuals and onsite compliance officers were negligent in the supervision of defendants 4-21, and further the extensive records and compliance manuals of defendants 1,2 and 3 facilitated the conduct of defendants 4-21 and further contributed to the creation of a substantial risk

of harm to Lamar Alsubaie, which contribution as aforesaid was a cause of the wrongful death of Lamar Alsubaie.


<u>REQUEST FOR RELIEF</u>

Based on these allegations, which Plaintiffs will prove at trial, Plaintiffs request the following relief:

    A.  All actual and compensatory damages allowed by law;

    B.  All punitive damages allowed by law;

    C.  All other damages allowed by law;

    D.  All attorney's fees, costs, and interest allowed by law; and

    E.  All such further relief that this Court deems just, equitable, honorable or appropriate in these premises.

<u>JURY DEMAND</u>

Plaintiffs demand to have all claims and issues in this case which are triable to a jury, tried by a jury.


WHEREFORE, Plaintiffs ALI ALSUBAIE and SUWAYYIR SAAD ALSUBAIE pray for judgment in their favor and against Defendants.


Dated: June 2, 2010.

    Respectfully Submitted,


            */s/ R. Bret Beattie*
            R. Bret Beattie, #39805
            The Bret Beattie Law Firm
            12605 E. Euclid Drive
            Centennial, Colorado 80111
            Telephone: (303) 708-1300
            Fax: (303) 708-1612
            E-mail: bret@bretbeattielawfirm.com
            Attorney for Plaintiffs

*/s/Charles R. Free*
Charles R. Free #16476
The Law Firm of Charles R. Free, LLC
12605 E. Euclid Drive
Centennial, Colorado 80111
Telephone: (303) 708-1300
Fax: (303) 708-1612
E-mail: cfree55555@aol.com
Attorney for Plaintiffs