**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  10-cv-01293-PAB-KLM

ALI ALSUBAIE, an individual and SUWAYYIR SAAD ALSUBAIE, an individual (as the biological father and mother and legal guardians of Decedent, LAMAR ALSUBAIE, their female, infant daughter)

      Plaintiffs,

v.

1. HCA INC., also known as HEALTHTRUST, INC., (aka) Hospital Corporation of America, a Delaware Corporation officially registered with the United States Securities and Exchange Commission as "HCA Inc." [It's EXACT NAME] – pursuant to its charter and S.E.C. regulations, with its "principal executive office:" located in Nashville, Tennessee.

2. HCA – HealthONE LLC ("Principal Mailing Address" Nashville, Tennessee) aka HealthONE, including or (aka) HealthONE CLINIC SERVICES – CARDIOVASCULAR, LLC, HealthONE CLINIC SERVICES – MEDICAL SPECIALTIES, LLC, HealthONE CLINIC SERVICES – OBSTETRICS AND GYNECOLOGY, LLC, HealthONE CLINIC SERVICES – PEDIATRIC SPECIALTIES, LLC, HealthONE CLINIC SERVICES – PRIMARY CARE, LLC, HealthONE CLINIC SERVICES – SURGICAL SPECIALTIES, LLC, and/or HealthONE CLINIC SERVICES LLC, all of which are HCA Inc.'s wholly owned and controlled d/b/a for a group of hospitals, miscellaneous medical facilities, by means of joint venture, "affiliation" and/or other legal relation;

3. HCA-HealthONE, LLC ROSE MEDICAL CENTER an Affiliate; (aka "The Baby Hospital" or "Denver's Baby Hospital" a moniker of Defendants) [According to "HCA" documents regarding HealthONE may include interests of or d/b/a's such as ROSE HEATH PARTNERS, LLC, ROSE MEDICAL PLAZA, LTD, ROSE POB, INC., NEW ROSE HOLDING COMPANY, INC.] and pursuant to Colorado Secretary of State information – [True name of registrant: HCA-HEALTHONE, LLC]

4. DR. PAMELA GEWINNER, M.D., individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

5. DR. JOE TONEY, M.D., individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

6. <u>DR. JANIS JOHNSON</u>, M.D., individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

7. <u>DR. RICHARD CHRISTOPHER ROMERO, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

8. <u>DR. GARRETT M. GANNUCH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

9. <u>DR. JOHN C. ROTH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

10. <u>DR. ROTHENBURG, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center; and any one or more names by which Defendants may be identified.

11. <u>DR. SUZANNE YODER, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

12. <u>DR. BRUCE BLYTH, M.D.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

13. <u>BARBARA J. ROBEDEE, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

14. <u>MELISSA S. GIEK, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

15. <u>CHRISTEL CIPRI</u>, certified surgical technician, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

16. <u>LINDSAY HIETT, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

17. <u>COREY J. MALECKI</u>, Assistant, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

18. <u>MICHELLE F. JASKUNAS, C.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

19. <u>CHERYL GRAY, R.N.</u>, individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

20. <u>A. SMITH, R.N.</u> individually and as an Employee/Agent of HCA, INC and HealthONE LLC and Rose Medical Center;

AND

21. <u>DR. WES TYSON PEDIATRIC PATHOLOGIST</u> , individually and as an Employee/Agent of HCA, INC and HealthONE LLC and  Presbyterian/St. Luke's Hospital.

Defendants.

---

**PLAINTIFFS' FIRST AMENDED COMPLAINT and JURY DEMAND**

---

In support of their First Amended Complaint, ("Complaint") Plaintiffs ALI ALSUBAIE and SUWAYYIR SAAD ALSUBAIE by undersigned counsel state and allege:

## I.      <u>INTRODUCTION</u>

This action is brought by Plaintiffs in connection with the wrongful death of their daughter, LAMAR ALSUBAIE (Decedent).  This Federal District Court Civil action and its legal analytical framework is designed to render justice by the precise and measured use of the instruments of law, reason and evidence applied rigorously to fulfill its truth seeking function. Plaintiff's bring this case in reliance upon <u>Wrongful Death</u>, <u>Negligence</u> and related principles.

While the allegations set forth in this complaint identify specific  acts, omissions, conduct, behavior and conditions both within and outside the geographic confines of a hospital,

the claims do not depend upon or arise from "the practice of medicine" or the geography of a hospital.  The legal proximate cause of Lamar Alsubaie's death and the basis for this action is the collective result of Defendants' use of a critical time period during which the "<u>substantial risk"</u> of death to Lamar Alsubaie: a) existed; b) was known by Defendants c) was consciously disregarded by Defendants.  Specifically, Defendants did not "practice medicine" by any reasonable definition.  Instead, Defendants used this time period to practice deceit, concealment, misrepresentation, document tampering, including information provided to the Chief Medical Examiner and multiple other acts to the benefit of Defendants multiple self interests.

Neither medical procedures nor the practice of medicine killed Decedent.  Application of a Medical Malpractice analytical model to the facts of this case would not meet the ends of justice by the precise and measured use of the instruments of law, reason, and evidence;  not fulfill the adversarial process truth seeking function and lead to absurdities. Plaintiffs' claims are brought to provide the proper analytical framework for conduct, omissions and conditions which are troubling, base and require a skill set perhaps better suited to lesser pursuits, but certainly not medicine.

## II.  JURISDICTION and VENUE

1.      Plaintiffs are and were citizens and subjects of the Kingdom of Saudi Arabia. Decedent, LAMAR ALSUBAIE is the biological daughter of Plaintiffs. Plaintiffs are temporarily in the United States attending to undergraduate studies over the course of the next several years at the University of Colorado in Denver.

2.      Defendant HCA, INC. aka HEALTHTRUST INC. is a Delaware, USA Corporation with headquarters in Nashville Tennessee, USA, and HCA Inc. pursuant to HCA documents is also identified as or known as:

A.      HCA, INC. (Hospital Corporation of America/ Healthtrust, Inc., and Healthtrust,Inc. is "the first tier subsidiary of HCA, INC." and operates such that HCA, INC and HEALTHTRUST, INC file separate financial statements as required by the United States Securities and Exchange Commission disclosure regulations. However, both entities (HCA, INC. and HEALTHTRUST, INC.) due to their corporate, structural relationship operate so that *all* subsidiaries of HCA, INC. are also the operating subsidiaries of HEALTHTRUST, INC.

B.      HCA, INC., its "affiliates", including direct, indirect subsidiaries, partnerships, and joint ventures arising from and related to HCA, INC. operate healthcare related facilities in twenty separate states in the United States of America and some facilities in England.

C.      HCA, INC.'s "affiliates" (Paragraph 2B) include: "HealthONE" and other Defendants named in this Complaint identified as Defendants 1, 2, 3 and 4-21 in the caption, including various aka's of said Defendants and Defendants' "affiliates"-component subsidiaries as named in the caption of Plaintiffs' Complaint as Defendants 2 and 3.

D.      Defendants 4-21 (listed below and incorporated herein in this Section 2D) are persons, licensed physicians, surgeons, specialists, nurses, and assistants and others who are employees, agents and otherwise legally related, connected

controlled by and subordinate to HCA, INC. and its HealthONE "affiliates" and further subject to direct control of HCA, INC. by multiple means including, by example and not limitation, HCA, INC.'s "Ethics and Compliance Policies," "Code of Conduct," "Monitoring and Auditing Programs," "Legal Policies and Procedure," "Quality Management (QM) Policies and Procedures," Document Management Protocols, Policies and Procedures, multiple other enforceable by consequence, control mechanisms and their respective multiple subparts (re: policies) and further enforced by on site "Compliance Officers" and "Random Audits" and various, numerous other means by which HCA exerts control over (but subject to selective application of such control by those with power and control). Defendants 4-21 are identified in further detail in the Caption of this Complaint and the subsequent body of this Complaint.

4. DR. PAMELA GEWINNER, M.D.,

5. DR. JOE TONEY, M.D.,

6. DR. JANIS JOHNSON, M.D.

7. DR. RICHARD CHRISTOPHER ROMERO, M.D

8. DR. GARRETT M. GANNUCH, M.D.,

9. DR. JOHN C. ROTH, M.D

10. DR. ROTHENBURG, M.D

11. DR. SUZANNE YODER, M.D.,

12. DR. BRUCE BLYTH, M.D.,

13. BARBARA J. ROBEDEE, R.N.,

14. MELISSA S. GIEK, R.N.,

15. CHRISTEL CIPRI, certified surgical technician,

16. LINDSAY HIETT, R.N.,

17. COREY J. MALECKI, Assistant,

18. MICHELLE F. JASKUNAS, Certified Nurse-O.R.

19. CHERYL GRAY, R.N.,

20. A. SMITH, R.N. The initials and signature of  A. Smith, R.N.  appear on multiple
   documents relevant to the issues in this case, she assisted other Defendants,
   named in the complaint, during, before and after.  Such defendants engaged in
   conduct complained of by Plaintiffs as more fully set forth in this complaint and
   in particular, the conduct which caused the death of Lamar Alsubaie.

21. DR. WES TYSON PEDIATRIC PATHOLOGIST, individually and as an
   Employee/Agent of Presbyterian/St. Luke's an affiliate of HCA, Inc.  Dr. Wes
   Tyson's pathological conclusions were (for whatever reason) adopted by Rose
   Medical Center and put into the  version of a pathology report signed by Lian A.

Bonds 6-20-08 of Rose Medical Center. Dr. Tyson assisted other Defendants in this action by furthering the concealment of issues and conditions which, as more thoroughly described in this complaint, caused the death of Lamar Alsubaie. According to the "Rose" pathology report:

> "Materials on this case were forwarded directly to Dr. Wes Tyson, pediatric pathologist at Presbyterian/St. Luke's Medical Center; Denver, Colorado.   The content of this report including microscopic description, diagnosis and above comments reflect his [presumably Tyson's] findings. (A complete copy of the consultant's report is available through the Pathology Department.)"

3.     Federal Jurisdiction is based upon 28 U.S.C. §1332(a)(2) (Diversity) [with an amount in controversy exceeding Federal minimum threshold and exceed $500,000]

4.     Venue is proper in the District of Colorado as the death of Lamar Alsubaie and certain significant events surrounding the allegations of Plaintiffs' complaint arose in Denver, Colorado.  Further, although HCA, HealthONE *et. al.* are based in Tennessee, incorporated in Delaware and other locations, said Defendants, both directly and indirectly are connected to, committed acts and omissions of significance in, and are otherwise related to matters set forth in this Complaint in such manner that the Federal District Court in Colorado is the proper venue for this matter.

## II.  GENERAL ALLEGATIONS-SECTION A

("Explanatory Note"- Application of the Wrongful Death Statute.)

5. Plaintiffs incorporate paragraphs 1 through 4 as though fully set forth herein.

6. This action is a wrongful death and negligence claim brought by Plaintiffs against Defendants.

7. This action arises because of the wrongful death of an infant, Lamar Alsubaie, the infant daughter of Plaintiffs.

8. This action is founded in many respects upon Colorado Revised Statute ("C.R.S."),  Title 13, Article 21, section 201, et.seq. (the "Wrongful Death Statute").

9. Plaintiffs' claims against Defendants do not depend upon whether Defendants, or any of them committed acts of medical malpractice in this Wrongful Death/ Negligence action. The legal proximate cause of Lamar Alsuabie's death was not a function of the "practice of medicine".

10. Lamar Alsuabie died because Defendants knew that Lamar Alsuabie (an infant) was in an emergent state, that the emergency was caused by Defendants including physicians and surgeons, among others and that despite having time to act upon their knowledge of the infant's condition by any number of options, Defendants used an infant's critical window of time to protect themselves from embarrassment and other consequences harmful to Defendants, by doing nothing, and by using their advantageous position vis-à-vis Lamar's parents who did not understand English very well and vis-à-vis Lamar because as a baby (age 41 weeks) Lamar could not complain.

11.    In essence, and by way of summary, Defendants <u>did not practice medicine.</u>  Instead, Defendants, as evident in "Rose" documents, tried to conceal their conduct as further described in this Complaint. Lamar Alsubaie died because Defendants, rather than practice medicine, used valuable time <u>to practice deceit</u>.  The deceit practiced required no medical degree (MD); it did require disturbing and reprehensible behavior.  A <u>sampling</u> of Defendants' behavior is set forth below in sub-paragraphs a through j.

    a.    The Defendants disregarded a substantial and unjustifiable "risk" (hereafter "RISK" );

    b.    The "RISK"  was known to Defendants;

    c.    The "RISK"  as to Lamar Alsubaie as used herein includes multiple substantial risks, including Lamar Alsubaie's death;

    d.    "*Notice*", "*knowledge*", "*known to*" as used here includes, and despite Defendants' concealment efforts, multiple indicators of multiple types which indicate and implicate "notice";

    e.    Defendants capitalized on Plaintiffs' english language deficiencies.

    f.    Defendants created two succssive "informed consents," the second referring to a procedure (kidney biopsy) already authorized in the first. Moreover, both the existence and medically unprofessional content raise grave concerns.

    g.    Stunningly,  Defendant Yoder, in a 6/2 "Medication Order" obliterated by her, in part, directed that Lamar be fed by mouth starting 6/3 and contrary to required protocol, failed to indicate the time the "Order" was made.

h.   The 6/2 "order" states: "NPO (i.e feed -not by mouth) until 6/3… [i.e. feed by

mouth 6/3]…." Such order is antithetical to the overall  plan preceding it and

the surgical procedure which Defendant Yoder performed on 6/2 , the

placement of a the "Broviac Catheter" intended to serve as a conduit for

feeding the TPN solution. (The last five lines of Dr. Yoder's order has been

obliterated by actions which required great effort.)

12.   Rose records reveal Lamar Alsubaie's death *did not*:

a.   Result from Defendant Gwinner's procedure on May 28, 2008; and did not

result from Defendant Yoder's procedure on June 2, 2008;

b.   Result from the mere proper use of the Broviac catheter for its intended

purpose;

c.   Result from the *practice of medicine*.

### III.  GENERAL ALLEGATIONS-SECTION B

(Summary Chronology and Context)

13.   Plaintiffs incorporate paragraphs 1 through 12 as though fully set forth herein.

14.   LAMAR ALSUBAIE, was born on April 22 and died on June 2, 2008 at Rose Medical

Center.

15.   Decedent LAMAR ALSUBAIE, although born premature was by measure of pediatric

medicine, a premature baby with expected premature baby health issues consistent with a

neonate of 32 weeks gestation as reflected in Rose Medical Center Records.

16.     Decedent LAMAR ALSUBAIE, was expected to be discharged to the care of her parents, the Plaintiffs in this matter, as reflected in Rose Medical Center records including but not limited to "Discharge Teaching and Planning" sheets and "Progress Reports" found in Rose Medical Center records.

17.     Further evidence of Decedent's optimistic future was conveyed to Lamar's parents (the Plaintiffs) on May 30, 2008 (3 days before Lamar died) by Dr. Gewinner, as reflected in a progress report of 5/30/08 per Dr. Gewinner.

18.     Decedent LAMAR ALSUBAIE had "three major issues" (according to a "Rose" record):

    a.   Hypothyroidism – To be treated with synthriod – first three years of life (and could be function of premature birth).

    b.   Pyloric Stenosis – Dr. Gewinner drew a picture for Plaintiffs and explained the operation to correct the condition, a pyloromyotomy-(i.e. fix stenosis of pylorous).

    c.   Alleged Kidney problems – Specifically, a form of nephrotic syndrome.

    d.   The existence and extent of the nephrotic syndrome diagnosis is in question since among other things the Medical Examiner examined kidney samples and recorded observations different from the "Rose" pathology report.

    e.   Dr. Gewinner also explained to the parents that operative/surgical procedures were planned for Monday June 2, 2008.

f.  On May 28, 2008, Dr. Gewinner performed a "placement of surgical venous catheter" procedure as reflected in a very sparse, imperfect procedure/op report.

g.  The procedure identified above was marked by multiple "complications."

h.  The procedure above refers to "placement of CVL" (presumably, central venous line) and identifies the time of procedure as 14:30 (i.e. 2:30 p.m.)

i.  From 4/22/08 to 5/28/08 (morning) "Physicians Order Forms  Newborn Perenteral Nutrition" identify use of a "peripheral line" not a central line.

j.  From the 5/28/08 procedure identified above, through 6/2/08 and in reliance on "Rose" Records, 3 additional procedures were performed on Lamar Alsubaie.

    i.  A kidney biopsy as discussed on 5/30/08 with Lamar's parents.

    ii.  A pyloromyotomy to correct pyloric stenosis as discussed on 5/30/08 with Lamar's parents.

    iii.  A Broviac Catheter Placement using a subclavian approach (Seldinger technique).  A procedure not discussed during the 5/30/08.

19.  A Broviac Catheter with its soft tip is and was manufactured by BARD Access Systems.

20.   Although common sense would suggest that a surgeon would know the protocols for introduction and placement of a Broviac catheter, "BARD," nonetheless provides very specific instructions.

21.   The "BARD Instructions Manuals" are quite thorough and include pictures and illustrations.

22.   Further, there may be found, a number of learned medical journals, articles and texts regarding this common procedure.

23.   It is well accepted that the primary concern with respect to the Broviac procedure is risk of infection.

24.   A rare, but potentially deadly complication might include perforation of a central vessel such as the superior vena cava.

25.   If such complication should occur, it is understood as an emergency which may result in death.

26.   With respect to central vessel perforation, there are numerous indicators or red flags.

27.   On June 2, 2008, at approximately 5:30 p.m. Dr. Suzanne Yoder started the procedure of introduction and placement of the Broviac Catheter.

28.   "Rose" records indicate that the procedure was problematic; took approximately 43 minutes and multiple attempts at placement were performed.

29.   "Rose" records indicate that, the Broviac procedure itself progressed as follows:

    a.   Started 6:02 p.m.

    b.   Finished 6:45 p.m.

c.  That the surgical nurse who started the procedure (Michelle F. Jaskunas) was relieved just 2 minutes before the completion of the Broviac placement. (She was relieved by nurse Barbara J. Robedee at 18:43/6:43).

d.  That at least 2 catheters were used.  The first (per Dr. Yoder's operative report) was "…dysfunctioning." "…removed" and "an additional 4.2 catheter was obtained…"

e.  The use of 2 catheters is in conflict with "Rose" "interaop assessment records." Page 8 refers to "implants" but mentions only one, not two, devices.  Although the serial number and quantity (1) are specifically identified, there is no mention of a first Broviac (described as dysfunctional by Dr. Yoder).

30.    The "Rose" records entitled "intraop assessments" are suspect and may reflect tampering.

a.  "Rose" has 2 such reports on the Yoder procedure: one identifies the procedure in "OR Room 1" and the other identifies the procedure in "OR Room 8."

b.  A *third version* (the one which was transmitted to Medical Examiner, Amy Martin), is different and does not include even the category "implants" among other distinctions.

c.  Dr. Yoder's operative report (signed on June 9, 2008) does not even include the topic heading "Complications" for a procedure which appears rife with complications.

    d.   Virtually all other documentation which relates to June 2, 2008/Lamar Alsubaie, unlike Dr. Yoder's report, are signed/completed on 6/2/08 or 6/3/08 (the day after Lamar Alsubaie died.)

31.    Dr. Blyth, performed the Kidney biopsy as Dr. Yoder finished her procedures.  "Rose" records show that Dr. Blyth completed the procedure at 8:00 pm, but nevertheless remained alone in the operating room with the infant until 8:22 p.m. without documenting the medical purpose for his extended presence in the records (other Defendants may also have been present.)

32.    There were 2 "informed consents" for the same procedure.

33.    Br. Blyth's procedure is confirmed by the first "informed consent" indicating what one would expect to see: "a) Procedure- renal biopsy; … Reason: -nephrotic syndrome".

34.    Dr. Blyth and/or Dr. Yoder obtained a <u>second</u> "informed consent" which inexplicably refers to a "right renal biopsy" and provides a new stated "reason" as: "find cause of protein leakage", in patently un-medical terminology.  Such terminology was expressly designed to mislead the parents.

35.    The second consent form fails to follow medical conventions in the following respects:

    a.   The first informed consent expressly permitted for the renal biopsy.

    b.   The stated "reason" to "find cause of protein leakage" is erroneous and inconceivable.

    c.   A Kidney biopsy specimen presumably, and as indicated, goes to a pathologist who examines a specimen "grossly" and "microscopically" in order to report findings "consistent" or "inconsistent" with the nephrotic syndrome diagnosis.

36.     The so-called second "informed consent" is further problematic in light of the special

duties a physician owes to a patient, or an infant's parents, to assure good, accurate,

truthful information is conveyed and understanding is confirmed.

37.     The reason Lamar Alsubaie died cannot be determined by reference to, or, reliance upon,

the analytical tools of medicine.

38.     The infant died at 11:38 pm on June 2, 2008 according to the "Rose" record entitled

"Death Summary."

39.     Lamar Alsubaie died after a nurse performed her job and infused TPN into the Broviac

Catheter.

40.     With a properly placed Broviac the TPN would exit the soft tipped Broviac Catheter at

or just superior to the right atrium of the heart inside the Superior Vena Cava where it

would be efficiently dispersed by the heart.

41.     Instead, the TPN fluid flooded the pericardial sac, compressed Lamar's heart, leading to

rapid onset of Bradycardia (slow heart rate) and Lamar died.

42.     The feeding should not have occurred and it can be reasonably inferred that the Nurse

who fed Lamar was not included in the circle of Defendants who knew before the

feeding, what the medical examiner found at autopsy 12 hours after Lamar died.

43.     Even the "Death Summary" prepared by Defendants after it was impossible to claim

ignorance is rife with dishonesty. This list is long and includes inaccurate ICD-9 codes.

## FIRST CLAIM FOR RELIEF

### (Wrongful Death)

This action involves the "wrongful act(s), neglect or default(s) causing death which, as to one or more party defendants "constitute a felonious killing, as defined in section 15-11-803(1)(B), and as determined in the manner described in section 15-11-803(7), C.R.S. which  provides there "shall be no limitation on the damages for non-economic loss or injury recoverable in such action" (C.R.S. 13-21-203) (emphasis added).

44.     The "Felonious killing" for purposes of this action involve, "recklessly" causing the death of an infant by consciously disregarding "a substantial and unjustifiable risk."

45.     Plaintiffs expressly do not contend any defendant intentionally caused the death of a helpless infant.

46.     Physicians, nurses, surgeons, radiologists, employees, agents of Rose Medical Center, HealthONE, HCA, Inc. did not employ "Rose" records in furtherance of "good medical practices", as would be reflected in rigorously precise and complete medical records by use of customary , accepted, scientific medical terminology designed to fulfill their intended medical purposes.

47.     Physicians, nurses, surgeons, radiologists, employees, a gents of Rose Medical Center, HealthONE, HCA, Inc., did employ "Rose" records generated in connection with their observations of Lamar Alsubaie and with knowledge of her emergent condition to:

a.   The misuse of Rose records was expressly designed to create a misleading paper trail sufficient to conceal the actual event s leading up to and causing the death of Lamar Alsubaie.

b.   The "Rose" records were void of medical utility but rife with mislesding, incomplete and obtuse language.  Such inaccuracies served no legitimate medical purpose, but rather were designed to practice the most insidious form of "defensive medicine". That which operates not only to conceal crucial facts necessary for informed decision making for Lamar's care, but that which continues to conceal the true facts and circumstances surrounding her death.

c.   The concealment of material facts from Plaintiffs, including the conflicts of interest which arose as a result of ethical breaches and attempts to conceal damaging facts, deprived the Plaintiffs of the opportunity to regain control over medical decisions involving Lamar's care. Defendants course of conduct served to mask a grave danger caused by Rose's deficient infant care and its manifest conflicts of interest due to ratification of on-going attempts to conceal facts sufficient to cause reasonable parents to wrest control of Lamar's continued care from the "Baby Hospital" and seek proper care at a hospital free from the on-going conflicts which ultimately led to Lamar Alsubaie's death.  The same *independent* care which likely would have revealed an on-going conspiracy to conceal mistakes made in Lamar's prior

care, but which would detrimental to protecting the professional and business interests of the Defendants.

d.  The suspicious second so-called "informed consent" was expressly designed to prevent the transfer of Lamar Alsubaie to another unaffiliated hospital in order to minimize the risk of adverse business and legal consequences to Defendants. Whether the motive to promote or ratify the concealment was to increase corporate profits or protect professional careers from employment, licensing, liability issues will be a defendant-specific. Nevertheless, the concealment of *any* relevant facts from the Plaintiffs during the final critical hours of Lamar's life was tortious and a contributing factor which led to her death.

e.  Lamar Alsubaie died as the combined result of errors in judgment, lapses in medical ethics, and the practice of corporate medicine sufficient to promote and ratify the wrongful conduct which legally and proximately caused the death of Lamar Alsubaie.

f.  Minimize said Defendants' knowledge of the "substantial risk" of foreseeable "harm" attendant to Lamar Alsubaie's emergent condition by crafting the "Rose" records.

g.  That in the event that the "foreseeable harm" created by the "substantial risk" of which said physicians and professionals were aware, including the death of

Lamar Alsubaie, were to occur or otherwise manifest, the "Rose" records, by containing imprecise, unmedical and incomplete information would by such design serve the ends of law and possible legal/ethical defense; not medicine.

48.   At 11:55 am of June 3, 2008, about 12 hours after her death, Lamar Alsubaie's body was examined by Chief Medical Examiner Amy Martin, M.D. in conformance with expected pathological protocol and methodology.  Dr. Martin's report contains her observations and conclusions which are numerous and highlight Defendants' role in Lamar's death.

49.   Medical Examiner Dr. Amy Martin, M.D. observed something of particular import during her internal examination of Lamar Alsuabie at autopsy.  Her description, and the language she used is scientific, medical and measured.  Nonetheless, a gifted author of literature would likely fail to describe it with greater, but horrific, eloquence.  Thus, the verbatim quote of Dr. Amy Martin's autopsy report page 1 is set forth.

   a.   "… Perforation of Superior Vena Cava by distal end of Broviac catheter, with approximately 1.8 cm of Broviac catheter protruding through vessel.

   b.   Fluid removed from pericardial sac at hospital [Rose] consistent with TPN solution…."

50.   After opening the body for "internal examination" she made multiple observations including the TPN "fluid" in the pericardial sac (where it should *not* be).  It is the same fluid (TPN) introduced into Lamar's body a few hours earlier by a nurse at Rose Medical Center.

51.   The TPN fluid was delivered by "pushing" it into a "Broviac" catheter.

52.     A Broviac catheter by its design is intended for long term use and frequently used in infants.

53.     The Broviac "catheters", "specially formulated" and "radiopaque" (i.e. opacity to or impenetrability to) e.g. X-rays fluoroscopes make it visible to the nurses and doctors installing and monitoring it.

54.     Properly placed, with its tip (exit portal) inside the Superior Vena Cava just superior to (above) the right atrium of the heart, the Broviac is a sound means for delivering nutrients and medicines to an infant, who, for whatever reason should not be fed by mouth.

55.     Previously, Plaintiffs drew attention to what the Medical Examiner saw; TPN fluid in the wrong place, the pericardial sac or "pericardium" (the membrane covering the heart and anatomical beginning point of "the great vessels" such as the Superior Vena Cava; the pericardium is "a closed sac.")

56.     TPN fluid does not belong in the pericardium for many reasons. An accumulation of fluid in the "closed sac" which contains the heart would compress it when the fluid reached sufficient volume to cause "cardiac tamponade" (compression of the heart). In plain language, and in light of the pressure exerted, available space in the pericardium, other related factors, the fluid will, by anatomical necessity, occupy space belonging to the heart. At best, this presents an emergency, at worst a fatality.

57.     The preceding paragraph having addressed one of two significant reasons that TPN does not belong in the pericardium.  The second may be described as follows:

a. "TPN" total perenteral nutrition, means in general and certainly as to Lamar Alsubaie, provision of nutrition, medication and anything else to sustain her, not by mouth but by tube. The tube in Lamar's case was a "Broviac catheter".

b. TPN also serves another critical purpose. By use of TPN, a pediatrician may methodically track the list and quantities of substances entering the infant's body. Thus, a monitoring pediatrician can now enhance the reliability, and validity of ongoing lab results.  Blood and urine may be drawn from an infant for laboratory analysis so that organic/inorganic compounds of the infant's biochemistry may be measured against accepted "reference ranges" to facilitate the pediatrician's ongoing assessment of an infant's health, the detection of elevated/diminished (high/low) levels of various substances may implicate various possible disorders for example, (i.e. assisting the differential diagnostic process.) Armed with controlled, identified amounts and types of substances ingested, provides enlightened opportunity to obtain information from lab results of <u>increased reliability</u> by avoiding misinterpretation of values which could be influenced by ingestion of types/amounts of substances unknown/unmeasured.

58. Most certainly, it would be absurd, from a physician's perspective to feed an infant by mouth after placement of a feeding tube (Broviac catheter here).  Whether due to emesis (vomiting) or its cause (pyloric stenosis here), the decision to install/place/thread a Broviac catheter line into the Superior Vena Cava of an infant is taken seriously and a long term commitment to attending such catheter. Preempting infection, etc. is a given.

59.     Medical Examiner Dr. Amy Martin, M.D. observed something else of import during her

        internal examination of Lamar Alsubaie at autopsy. Her description and the language she

        used is scientific, medical, measured. Nonetheless, a gifted author of literature would

        likely fail to describe it with greater but horrific eloquence.  Thus verbatim quote of Dr.

        Amy Martin's autopsy report page1 is set forth verbatim from pps. 1 and 5:

                "…

        A.  Perforation of Superior Vena Cava by distal end of Broviac catheter,

            with approximately 1.8 cm of Broviac catheter protruding through

            vessel.[1]

        B.  Fluid removed from pericardial sac at hospital [Rose] consistent with

            TPN solution…."

60.     Lamar Alsubaie was pronounced dead at 11:38 p.m. June 2, 2008 at Rose Medical Center

        about 12 hours before Dr. Martin's autopsy started.

61.     Plaintiffs aver and allege upon what is already known and upon reasonable belief and

        inference, that Lamar Alsubaie did not die because she was fed TPN by Broviac catheter.

62.     Rather, the cause of death, both as a matter of simple, common sense and legal,

        proximate cause is found in base, servile, ignoble, human behavior. Plaintiffs aver that :

        a.  Lamar Alsubaie should not have been fed via Broviac on the eve of her death.

        b.  Defendants 4-21 knew and had notice of the fact that the Superior Vena Cava

            had been perforated.

---

[1] In common US/English measurement 1 cm.=.3937ths of an inch. Thus 1.8cm. x .3937=.70866
of 1 inch or almost 3/4ths of an inch.

c.   With respect to allegation b above, such notice and knowledge was obtained well in advance of the death of Lamar Alsubaie and the Broviac feeding which should not have occurred on June 2, 2008.

d.   Dr. Pam Gewinner, (as reflected in a baffling example of an operative/procedural report) on 5-28-08 performed a procedure entitled "placement of surgical venous catheter….Baby's name: Alsubaie, Lamar, Indications: Difficult IV access complications: Line was accidentally pulled out…." (this procedure was six days before Lamar's death .)

e.   The 5-28-08 Gewinner report refers to the "catheter" variously as "catheter, IV, line, CVL, CVL, catheter, catheter, catheter."  Terms all arguably accurate yet troubling in their overall context due to the need and requirement for precision in medical terms.

f.   Doctors, nurses, surgeons radiologists fail to detect on x-ray or otherwise that a perforation of the Superior Vena Cava has occurred-an emergency, and despite the Broviac's opacity as to x-ray, despite "Beck's Triad" (onset signs of cardiac tamponade, despite ,  (Dr. Yoder's 6-2-08 Broviac compilations-despite other warning signs/red flags known to such Defendant here by training, experience and otherwise.

g.   Dr. Suzanne Yoder performed a Broviac placement procedure and pyloromyotomy to correct Lamar's pyloric stenosis, while Dr. Blyth subsequently, but as part of an ongoing procedure performed a kidney biopsy. And the Broviac placement procedure was rife with alleged complications

including "unable to get good blood return" (Dr. Yoder's words), when failure to get good blood return is **the subject** of a learned treatise identifying it as a warning sign of misplacement/vessel perforation, a subject which appears in other medical literature.

h.   Dr. Yoder's operative report does not include a standard topic heading for "Complications".

i.   Dr. Yoder's report reflects she is satisfied that the Broviac tip is properly placed by reference to a pre-existing PICC line. Except the PICC line, which x-ray does detect on several occasions before 6-2-08,-on said x-rays have it in, or wandering about the central venous structure.

j.   It took Dr. Yoder 43 minutes to place a Broviac in Lamar which implicates some difficulty. And further Dr. Yoder having identified one Broviac as dysfunctioning implicating the use of at least two Broviacs- when "Intraop Assessment" documents identify by lot number, etc. only one Broviac. And, of further interest; the intraop assessment form which reaches the Medical Examiner's office seems to be missing that section of the report.

k.   As to "Intraop" reports there are some inconsistencies and perhaps more than one version (not due to different authors only, but for example, one which has the ongoing procedure in operating room "8"-but another which has the 6-2-08 Yoder/Blyth procedure in OR "1".)

l.   Undersigned counsel were given a copy of Rose records which were retrieved by a grieving father on November 2009-and –these records are clearly and unequivocally missing documents which should be, but are not, included.

m.   Undersigned counsel based on said records, cannot find a Defendant's acknowledgement of a potentially fatal condition-vessel perforation onset of cardiac tamponade.

n.   That Dr. Yoder's 43 minute Broviac placement attempts were, per her operative report performed with the aid of fluoroscopy (a motion picture x-ray) but a few hours later Dr. Gannuch/radiology receives a an emergency call and his report identifies *18 seconds* of fluoroscopy-(from a 43 minute procedure).

SECOND CLAIM FOR RELIEF

NEGLIGENT SUPERVISION –Against HCA, et.al

(Defendants 1, 2 and 3)

88.   Plaintiffs incorporate, in this Second Claim For Relief paragraphs 1 through 87 as though said paragraphs were fully set forth herein.

89.   Defendants HCA, Inc., HealthONE and Rose Medical Center (Defendants 1,2 and 3) by and through means of their extensive records and compliance manuals and onsite compliance officers were negligent in the supervision of defendants 4-21, and further the extensive records and compliance manuals of defendants 1,2 and 3 facilitated the conduct of defendants 4-21 and further contributed to the creation of a substantial risk of harm to

Lamar Alsubaie, which contribution as aforesaid was a cause of the wrongful death of Lamar Alsubaie.

90.   Plaintiffs incorporate by reference, Exhibits A, B, and C from this Plaintiffs First Amended Complaint which lists all names and descriptions of Defendants HCA Inc., HealthONE and Rose Medical Center which are known to Plaintiffs at this incipient stage of litigation.

91.   With respect to Exhibits A, B and C listed above, Plaintiffs seek to:

    a.   Provide clarity, by avoiding any confusion regarding the named defendants which could unnecessarily cause collateral and time-consuming disputes whether mechanical (i.e. who will be responsible to fulfill disclosure and discovery obligations) or legal (i.e. as to each entity, its name or description may permit it to or attempt to employ, a variety of different defenses;

    b.   Assure that even at the early stages of litigation, a federal judge or magistrate be called upon to enter orders (not just orders imposed automatically by rule) may do so without question as to whom or at what, the order is directed;  and with the objective that

    c.   The Plaintiffs, Defendants and the Court will benefit by avoiding unnecessary cost and waste of time while simultaneously furthering the ends of justice.

92.   Unless otherwise specified, the term "Defendant(s)" as used in this Second Claim for Relief shall mean HCA, HealthONE and Rose or Defendants 1,2 and 3 respectively.

93.     Defendants 1,2 and3 are hereby notified that in answering the allegations in this Second

Claim For Relief, that Plaintiffs understand that paragraphs 90  through 92 above,

regarding Exhibits A,B and C, are more explanatory than accusatory.

94.     Defendant HCA, Inc. is governed by various self-created and self-imposed "codes of

ethics", "Policies", "Procedures" and other "Rules" designated by other names, which

"Codes", "Procedures", "Policies" and "Rules" are intended to, do apply to all

Defendants named in this First Amended Complaint.

95.     The Codes, Policies, Procedures and Rules may be found in Defendants' own documents

and by way of example, not limitation, include pamphlets, summary brochures and  a

voluminous set of such codes, policies, procedures and rules listed in a 17 page "Table of

Contents" which identifies sets of such codes, policies, procedures and rules.

96.     Although voluminous, and by way of example, not limitation such codes, policies,

procedures and rules, include topics such as ethics, compliance, legal, information and

technology services, materials management, quality management (and "core measures"),

regulatory compliance, risk and insurance, human resources among others.

97.     The aforementioned "topics" of  codes, policies, procedures and rules are specific and

allegedly impose precise, numerous specifications for Defendants' business operations,

and its agents conduct.

98.      Plaintiffs  allege that the *Codes*, *Policies*, *Procedures* and *Rules*, allegedly imposed and

enforced by training, onsite compliance officers and random audits, etc. would make

improbable, if not impossible fro Defendants to claim lack of notice and ratification of

the conduct legally causing Lamar Alsubaie's death.

99.     Plaintiffs allege that with respect to Lamar Alsubaie's death, Defendants' policies, coordination, corporate oversight and control permitted, facilitated and enhanced the the teamwork necessary to coordinate the efforts to mask, conceal and obscure the " known "substantial risk" to Lamar Alsubaie and Defendants' disregard of said risk. In this context, harm to Defendants' business and other self interests was prevented or diminished while an infant's life was lost as a result.

100.    Plaintiffs do not allege that any Defendants engaged in the "The Practice of Medicine" contrary to laws and regulation intended to preclude such practice.

101.    Plaintiffs allege that regardless of whether Defendants assert that medical malpractice created a substantial risk of harm to Lamar Alsubaie, the damage, an infant's death and its legal cause, the conduct complained of, bear no resemblance to any reasonable definition of "The Practice of Medicine", found in statute, regulation, venerable medical text, AMA code of ethos, mandate of Hippocrates or understanding of layperson.

102.    The fact that "Rose" boasts of a 24/7 cardiovascular team or the Defendants' medical skills, or the skills of others at Rose, which skills were not employed for Lamar's benefit, stands in defiance of the Practice of Medicine.

<u>REQUEST FOR RELIEF</u>

Based on these allegations, which Plaintiffs will prove at trial, Plaintiffs request the following relief:

A.  All actual and compensatory damages allowed by law;

B.  All punitive damages allowed by law and pled as required;

C.  Any and All other damages allowed by law;

D.  All attorney's fees, costs, and interest allowed by law; and

E.  Such further relief as this Court deems just, equitable, honorable or appropriate in this matter.

JURY DEMAND

Plaintiffs demand to have all claims and issues in this case which are triable to a jury, tried by a jury.

WHEREFORE, Plaintiffs ALI ALSUBAIE and SUWAYYIR SAAD ALSUBAIE pray for judgment in their favor and against Defendants.

Dated: June 25, 2010.

Respectfully Submitted,

*/s/ R. Bret Beattie*
R. Bret Beattie, #39805
The Bret Beattie Law Firm
12605 E. Euclid Drive
Centennial, Colorado 80111
Telephone: (303) 708-1300
Fax: (303) 708-1612
E-mail: bret@bretbeattielawfirm.com
Attorney for Plaintiffs

*/s/Charles R. Free*
Charles R. Free #16476
The Law Firm of Charles R. Free, LLC
12605 E. Euclid Drive
Centennial, Colorado 80111
Telephone: (303) 708-1300
Fax: (303) 708-1612
E-mail: cfree55555@aol.com
Attorney for Plaintiffs

Exhibit A to Plaintiffs' First Amended Complaint

1.    Defendant HCA Inc. (Defendant number one in Plaintiffs' "First Amended Complaint") pursuant to its own documents , is and may be identified by or under different names or titles.

2.    Defendant HCA Inc. (Defendant number one in Plaintiffs' "First Amended Complaint") by or under such names described in paragraph 1 of this exhibit exercises dominion and control over its various subordinate parts which collectively make up the whole of HCA, Inc.

3.    Defendant HCA Inc. pursuant to its own documents, identifies its names and titles and its parts as set forth below in paragraphs 4a-i.

4.    Defendant HCA Inc. INCLUDES , by HCA, Inc. definition:

    a.    "…Company", "HCA", "We", "our" or "us" as used herein [Form 10k filing with Securities and Exchange Commission, (hereafter "S.E.C.")], refer to HCA, Inc. and its affiliates unless otherwise stated or indicated by context." (Source: Part I, item 1 Form 10-K filed by HCA, Inc. as "Annual Report" period ended 12/31/09.)

    b.    "The term 'Affiliates' means direct and indirect subsidiaries of HCA, Inc. and partnerships and joint ventures in which such subsidiaries are partners." Source: Part I, item 1 Form 10-K filed by HCA, Inc. as "Annual Report" period ended 12/31/09.)

    c.    …"The terms 'facilities' or 'hospitals' refer to entities owned and operated by affiliates of HCA  and the term 'employees' refers to employees of affiliates of

HCA." (Source: Part I, item 1 Form 10-K filed by HCA, Inc. as "Annual Report" period ended 12/31/09.)

d.   HCA Inc. is also the "Hospital Corporation of America." (HCA, Inc. has assumed various legal structures. Multiple and various sources not likely the subject of dispute.)

e.   HCA Inc. has assumed various legal structures, private public, corporate, by merger, public offering and miscellaneous means.

f.   HCA Inc. was "reincorporated in Delaware in 1993" and has remained incorporated in Delaware from 1993 to the present". (Source: Part I, item 1 Form 10-K filed by HCA, Inc. as "Annual Report" period ended 12/31/09.)

g.   HCA Inc. maintains, and has maintained, its : "Principle Executive Offices" in Nashville, Tennessee.  (The location of "principal offices" is likely a result of its (HCA) founders, including Dr. Thomas Frist SR. , father of Tennessee Senator Dr. Bill Frist (Tennesee) who started "in the 1960's", an effort to build "Park View Hospital" in Nashville, Tennesee. (Source: HCA document entitled "HCA Our History".)

h.   HCA, Inc., by means of various named state-focused entities , owns and operates , "directly or indirectly" "general, acute care, psychiatric and rehabilitation hospitals" (approximately 163 total), plus, multiple other facilities (e.g. 105 surgery centers), medical office buildings," occupied by physicians who practice at (HCA) hospitals and other properties."

i.   With respect to paragraph 4(h) above, HCA, Inc. runs hospitals in the following twenty (20) states:

- Alaska ("Shared Services")

- California (e.g. HCA Far West Division)

- Colorado (HealthONE)

- Florida (e.g. HCA Tampa Bay)

- Georgia (Atlanta Shared Services)

- Idaho (Shared Services)

- Indiana (Shared Services)

- Kansas (HCA Midwest Division, e.g.)

- Kentucky (National Patient Account Services Kentucky)

- Louisiana (e.g. Baton Rouge Shared Services)

- Mississippi (Shared Services)

- Missouri (HCA Midwest Division, e.g.)

- Nevada (e.g. Sunrise Health)

- New Hampshire (Shared Services)

- Oklahoma (Shared Services)

- South Carolina (Shared Services)

- Tennessee (e.g. Parkridge Health System)

- Texas (e.g. HCA Houston)

- Utah (e.g. Mountain Star Health)

- Virginia (e.g. HCA Richmond)

34

j.   HCA Inc. owns , by way of example, not limitation, "Health Care Indemnity,

Inc." (HCI) as a "subsidiary"; which among other things, invests in "debt" and

"equity" securities.

k.   HCA, Inc. is also known as "Healthtrust Inc." as set forth in the caption of

Plaintiffs' First Amended Complaint.

l.   HCA Inc. owns and operates "HealthONE" (Colorado) and "Rose Medical

Center" of Denver, treated as Defendants Numbers 2 and 3 respectively, as set

forth in Plaintiffs' First Amended Complaint.

EXHIBIT B TO PLAINTIFFS' FIRST AMENDED COMPLAINT

1.       Defendant HealthONE (Defendant number 2- Plaintiffs' First Amended Complaint)

pursuant to Colorado Secretary of State filings has its "name" listed as "HCA-

HealthONE  LLC".

2.       Defendant HealthONE (Defendant number 2- Plaintiffs' First Amended Complaint) and

pursuant to the Colorado Secretary of State filings has a  "Principle Street Address" at

4900 S. Monaco Street Suite 3" but a "Principle mailing address"  at P.O. Box 750,

Nashville, Tn. (The same city as HCA Inc.'s  "Principal Executive Office".)

3.       HealthONE "…was [according to HealthONE] created in 1995 as a 50/50 joint venture

between  non-profit 'The Colorado Health Foundation', and… HealthONE Alliance".

4.       Defendant HealthONE is a for-profit entity, as are HCA Inc. and Rose Medical Center.

5.       The Colorado Health Foundation (identified in paragraph 3 above as a non-profit) files its

"Form 990 Return of Organization Exempt From Income Tax" pursuant to Form 990 as

"HealthONE dba The Colorado Health Foundation" (per its tax year 2008 return).

6.       Defendant HealthONE in its own literature ("Why choose HealthONE?") under the

heading of Healthcare Technology Jobs" commences the first paragraph under said

heading with the language "HCA(Hospital Corporation of America) a joint venture

partner in HealthONE,..." and further, in other publications it is noted that "HealthONE,

LLC is governed by a Board of Governors, half of whom are appointed by HCA the for-

profit partner of the LLC, and half of whom are appointed by the Colorado Health

Foundation" ( Denver Business Journal).

EXHIBIT C TO PLAINTIFFS' FIRST AMENDED COMPLAINT

1.      Defendant Rose Medical Center ("Rose") (Defendant Number 3- Plaintiffs' First Amended Complaint ) , according to Colorado Secretary of State filings,  maintains a "true name of registrant" entitled: "HCA-HealthONE LLC".

2.      Rose according to Colorado Secretary of State filings, lists its: 1) "Primary residence or usual place of business address" and its "primary residence or ususal place of business mailing address" as "Not Applicable".

3.       Rose refers to itself as one or more variations of "The Baby Hospital" or "Denver's Baby Hospital".

4.      Defendant Rose is affiliated and connected to various other Colorado Hospitals, medical practices, entities, and employees, non-medical and medical, some of whom are also listed and named defendants in this Plaintiffs' First Amended Complaint.